IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                Plaintiff,<br><br>     vs.<br><br>DON A. LANGFORD,<br><br>                Defendant. | **8:12CV344**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the court on the defendant's motion to dismiss for failure to state a claim, Filing No. 16. This is an enforcement action brought by the Securities and Exchange Commission ("SEC") for securities violations under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a *et seq.* In the complaint, the SEC alleges that defendant Don A. Langford, former chief credit officer and a senior vice-president at TierOne Bank, performed a number of deceptive acts in order to further a scheme to defraud investors.[1]

I. FACTS

The facts alleged in the SEC's complaint involve the receivership and eventual closure of TierOne Bank (hereinafter referred to as "TierOne" or "the Bank") in Omaha, Nebraska. In a detailed 30-page complaint, the SEC alleges that, as the chief credit officer and a senior vice-president, Langford played a dominant role in a scheme to hide

---

[1] The court is familiar with litigation involving the demise of TierOne. The SEC also filed an enforcement action against TierOne's former Chairman, Gilbert Lundstrom, and its President and CEO, James Laphen, for securities fraud, and against Gilbert Lundstrom's son, Trevor Lundstrom, for insider trading. *See SEC v. Lundstrom*, No. 12-cv-343 (D. Neb.). Those actions have been resolved through consent judgments. *See id.*, Filing Nos. 10, 14, and 15. Also, ERISA class action suits for breach of fiduciary duty were filed by beneficiaries of TierOne's Employee Stock Ownership and 401K Plans against the fiduciaries of those Plans. *See Bredthauer v. Lundstrom*, No. 4:10-cv-3132 (D. Neb.); *Laird v. Lundstrom*, No. 4:10-cv-3139 (D. Neb.); and *Barker v. Baird*, 8:10-cv-326 (D. Neb.) Those actions have also settled. *See, e.g.,* Filing No. 209 in 4:10-cv-3139.

millions of dollars of loan losses from the Bank's regulators, auditors and the investing public. Specifically, the SEC alleges that the defendant participated in a scheme to defraud; aided and abetted TierOne's fraud; violated various books, records, and reporting requirements; deceived TierOne's auditors; and aided and abetted TierOne's false SEC filings and false books and records.

TierOne Bank had traditionally been a thrift bank focused on residential and agricultural loans in Nebraska, Iowa and Kansas. Filing No. 1, Complaint at 1. Beginning in about 2004, the Bank expanded beyond its traditional borders and began making riskier loans to real estate developers in Las Vegas, Florida and Arizona. *Id.* When real estate prices plummeted in 2008, many of the loans had faltered or were faltering. *Id.* at 5. In June 2008, the Office of Thrift Supervision ("OTS") conducted a periodic examination of TierOne and reported significant concerns with the Bank's management and financial condition. *Id.* at 5. As a result, the OTS directed TierOne to maintain higher capital ratios. *Id.* The SEC alleges that Langford and other senior executives then began a scheme to manipulate and materially understate TierOne's losses. *Id.* at 2, 6.

The SEC alleges that TierOne was required to report losses on loans if the value of the underlying collateral (i.e., the underlying real estate project) dropped below the book value of the loan and to record the value of real estate repossessed by the Bank— called Other Real Estate Owned, or OREO—at the property's fair value. *Id.* at 2, 6-7. It alleges that declines in value generally required the Bank to report a loss. *Id.* at 7. Under Generally Accepted Accounting Principles ("GAAP"), TierOne was required to use all current, relevant information to value the collateral or OREO property. *Id.*

Generally, an increase in loan or OREO losses would drive the Bank's capital ratios down, which meant TierOne would be closer to falling below the OTS-mandated levels. *Id.* at 6. The SEC alleges that TierOne's management, including Langford, "intentionally delayed the process of obtaining current appraisals for properties that had declined in value, relying instead on inaccurate data and assumptions." *Id.* at 7.

The SEC alleges that Langford was part of an informal committee that evaluated the Bank's impaired or potentially impaired loans, which were documented in spreadsheets that contained estimates of the value of the collateral underlying the loans and loan impairment determinations (the "impaired loan templates"). *Id.* at 7-8. Langford was central to the scheme in that he managed the Bank's loan and OREO valuation process. *Id.* at 6-8. He was directly involved in the preparation of the so-called "impaired loan templates" that contained purported valuation estimates, and allegedly falsified the templates that were provided to the Bank's outside auditors. *Id.* at 6-7, 25. It contends that Langford played a key role in a scheme to inflate collateral values, hide loan losses, and thereby falsely report—to the regulators as well as the investing public—that TierOne was in compliance with the OTS-mandated capital ratios. *Id.* at 13-16. The SEC alleges that Langford's conduct in this regard included: "(1) ignoring new appraisals; (2) failing to obtain updated appraisals of collateral and OREO even when observable market conditions established that there was substantial deterioration in value since the last appraisal; (3) masking problem loans by extending additional credit to establish interest reserves ('extend and pretend'); and (4) failing to properly evaluate loans for impairments." *Id.* at 9.

The SEC outlines several specific actions that Langford allegedly performed to further the scheme. *Id.* at 13-18. In the summer of 2008, Langford refused to sell an OREO property (Gemm Homes) at a significant loss because, in Langford's words, "we no longer have the luxury of hitting the loan loss reserves." *Id.* at 10. He voiced that concern within one week of meeting with OTS to discuss the Bank's loan losses. *Id.* Later, in the fall of 2008, Langford fired an employee who requested an appraisal on an OREO property that showed the Bank should have taken an $800,000 loss, and he refused to take the write-down. *Id.* at 12. Langford then allegedly helped to extend millions of dollars in additional credit to a delinquent borrower without a new appraisal— in violation of TierOne's lending policy—despite stating he was "bewildered" that the property was worth "even half of what we're being told it's worth." *Id.* at 15.

The SEC alleges that Langford's actions allowed the Bank to mask delinquency of loans, thereby delaying the recognition of any additional loss. *Id.* at 15-16. In September 2008, Langford refused to accept an offer on property stating that "[w]e have a 2008 appraisal which would allow us to . . . hold at our current reserved position and that's all we can afford until we earn our way out." *Id.* at 13. The SEC alleges that in connection with that property, although he knew of significant deterioration in the value of the collateral, he did not order new appraisals for the properties, nor take into consideration the estimates of a Las Vegas workout consultant's estimates in preparing the impaired loan templates for those loans. *Id.* at 13.

In early 2009, Langford disregarded a new appraisal on the certain property that would have resulted in a $1.8 million write-down, in spite of warnings from the Bank's special assets executive. *Id.* at 11. Further, the SEC alleges that Langford continued

using a four-year-old appraisal to value a major, $30 million Las Vegas loan during the first and second quarters of 2009, despite acknowledging that an updated appraisal would show the Bank was "wildly deficient on collateral," and despite being informed of an updated valuation showing the property was likely worth only half the loan amount. *Id.* at 13-14. Also, the SEC alleges that in the spring of 2009, Langford deleted an impairment loan template showing a delinquency that would have required a $5.8 million write-off and told TierOne's special assets executive that he knew certain loans were impaired, but that the Bank could not afford the losses that would result from that determination. *Id.* at 17. In addition, the SEC alleges that Langford failed to include critical information about collateral values in the Bank's impaired loan templates even though he knew those inaccurate templates would be provided to TierOne's external auditors. *Id.* at 7-8.

The SEC also alleges that Langford failed to inform TierOne's accounting staff or external auditors of current, relevant valuation information on a number of loans and OREO properties. *Id.* at 11, 13-15, 16. It also alleges that Langford did nothing in response to an email in February 2009 from the Bank's special assets executive that expressed concern about the use of outdated appraisals, listed stale appraisals, and informed Langford that "astronomical" write-downs would result from properly valuing the loans. *Id.* at 19. The special assets executive asked, "In good conscience how long can we continue to believe these [loans] are properly reserved?" *Id.* Several months later, the special assets executive again wrote to Langford, reiterating the concern that the Bank "refuse[d] to update collateral valuations, out of the fear of what impact these actions may have on reserve levels," and explicitly expressing fear that the Bank was

5

"misleading the public." *Id.* at 20-21.  The SEC alleges that Langford took no action to correct the loan and OREO losses in TierOne's financial statements, nor did he forward the email to TierOne's accounting staff or outside auditors.  *Id.*  Also, he made no mention of the troubling email at the Sarbanes-Oxley (SOX) Committee meeting three days later, when he provided positive assurances to the committee that no one believed the financial statements contained material misstatements or omissions.  *Id.* at 21.

Further, the SEC alleges that Langford played a major role in developing an internal estimate of losses embedded in TierOne's loan portfolio, but did not disclose that estimate to auditors or regulators.  *Id.* at 19.  Langford's initial analysis indicated the Bank needed an additional $65 million in loan loss reserves; a refined analysis, entitled the "Best/Worst Case Scenario," showed losses ranging from a "best case" of $36 million to a "worst case" of $114 million.  *Id.* at 19-20.  The SEC alleges that Langford did not incorporate his Best/Worst Case Scenario figures into the impaired-loan templates, or share those figures with the Banks' accounting staff or external auditors.  *Id.* at 20.  The Bank's outside auditors resigned when they learned the analysis had been withheld.  *Id.*

The SEC also alleges that Langford's role in the scheme to defraud the regulators is shown in emails in the spring of 2009, including one that stated "I've been telling people around here for months now that this unwillingness/inability to admit what appears to be a reality must come to an end with new appraisals in hand before the regulators show up in October."  *Id.* at 22.  When the OTS ultimately required TierOne to update its appraisals, the appraisals revealed more than $130 million in loan losses.  *Id.* at 23.  TierOne was shut down by the OTS in June 2010, and filed for bankruptcy

later that month. *Id.* The SEC further alleges that as a result of the scheme to defraud, TierOne issued financial statements that were materially misstated in several public filings. *Id.* at 23-25.

The SEC asserts seven claims against Langford:  (1) violations of Section 10(b) and Rules 10b-5(a) and (c); (2) aiding and abetting violations of Section 10(b) and Rules 10b-5(a) and (c); (3) Violations of Section 13(b)(5) of the Exchange Act, 15 U.S.C. § 78m(b)(5)—Circumvention of Internal Controls and Falsified Books and Records; (4) violations of Exchange Act Rule 13b2-1, 17 C.F.R. § 240.13b2-1—Falsified Books and Records (Fourth Claim for Relief); (5) violation of Rule 13b2-2 of the Exchange Act, 17 C.F.R. § 240.13b2-2—Deceit of Auditors; (6) violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13, 15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13—Aiding and Abetting False SEC Filings; and (7) violations of Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A)—Aiding and Abetting False Books and Records.  The first two claims can be categorized as anti-fraud provisions claims and the third to seventh claims can be categorized as reporting and recordkeeping claims.[2]

The defendant moves to dismiss for failure to state a claim on which relief can be granted.  He argues that the SEC's complaint is deficient in that:  (1) the SEC does not provide adequate notice of the operative facts on which the claims are based; (2) the SEC has failed to plead fraud with particularity as required under Fed. R. Civ. P. 9; (3) the SEC fails to allege that Langford acted with the requisite scienter; (4) the SEC does

---

[2] Langford is expressly not charged with violating Rule 10b-5(b), which prohibits making an untrue statement of fact or material omission in public filings, but rather is charged with "scheme liability" under Rules 10b-5(a) and (c).

7

not adequately allege the requisite actionable conduct for imposition of either primary or secondary liability; and (5) the SEC attempts to circumvent the requirement that only "makers" of public statements can be held primarily liable under federal securities laws.

II.  LAW

    A.  Federal Rules

As a general proposition, a complaint must contain no more than "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But even though a complaint need not plead "detailed factual allegations," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), it must nonetheless "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). The complaint must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal. *Twombly*, 550 U.S. at 555. The court relies on the factual allegations in the complaint as true and affords the nonmoving party all reasonable inferences from those allegations. *See Palmer v. Illinois Farmers Ins. Co.*, 666 F.3d 1081, 1083 (8th Cir. 2012).

The Federal Rules also require that allegations of fraud must be stated with particularity.[3] Fed. R. Civ. P. 9(b). To satisfy this particularity requirement, the pleader

---

[3] With respect to actions for securities fraud by private individuals, the pleading requirements under the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(1), are more rigorous than the requirements under Fed. R. Civ. P. 9(b). *See Lustgraaf v. Behrens,* 619 F.3d 867, 874 n.2 (8th Cir.

8

must set out the "time, place, and content of the alleged misrepresentation with specificity." *Drobnak v. Anderson Corp.*, 561 F.3d 778, 783 (8th Cir. 2009). Essentially, the complaint "must plead the 'who, what, when, where, and how' of the alleged fraud." *Id.* A plaintiff must state an underlying basis for its assertions that is sufficient to provide some indicia of reliability. *United States ex rel. Joshi v. St. Luke's Hosp., Inc.,* 441 F.3d 552, 556 (8th Cir. 2006). Although a plaintiff need not allege specific details of every alleged fraud, the plaintiff must provide some representative examples of the alleged misconduct. *Id.*

Section 10(b) of the Securities Exchange Act makes it "unlawful for any person . . . to use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations the SEC may prescribe." *SEC v. Zandfor*, 535 U.S. 813, 819 (2002) (quoting 15 U.S.C. § 78j). The Congressional intent in passing this legislation was to inculcate a policy of full disclosure instead of the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry. *Id.* The statute should be interpreted flexibly to effectuate its remedial purpose. *Id.*

Rule 10b-5 implements the statute. See 17 C.F.R. § 240.10b-5. Subsection (a) of that Rule forbids any person "to employ any device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b-5(a). Subsection(b) of the Rule prohibits a person from making "any untrue statement of a material fact" or from omitting "a material fact necessary in

---

2010). However, the heightened pleading standards of the PSLRA do not apply to complaints filed by the SEC. *See In re Reserve Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 317–19 (S.D.N.Y. 2010) (holding that when the SEC brings suit under Section 10(b) and Rule 10b-5, the PSLRA does not apply to the action); *SEC v. Rana Research*, 8 F.3d 1358, 1364 (9th Cir. 1993) (securities laws apply differently to the SEC than they do to a private plaintiff, because "Congress designated the SEC as the primary enforcement agency for the securities laws").

order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Subsection (c) of the Rule forbids any person "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5(c).

Only the "maker" of a statement is liable under Rule 10b-5(b). *Janus Capital Group, Inc. v. First Derivative Traders*, — U.S. —-, —- 131 S. Ct. 2296, 2302 (2011) (stating that for purposes of Rule 10b-5(b), "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it" and analogizing the situation to the relationship between a speechwriter and speaker—the speechwriter drafts the speech, but the speaker is responsible for its content and is the person who takes the credit or the blame for what is said). Conduct itself can be deceptive, such that liability under Rule 10(b)-5(a) or (c) could be sustained without a specific oral or written statement. *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 158 (2008). Violations of subsections (a) and (c) are referred to as "scheme liability." *Id.* at 159-60. In the Eighth Circuit, "'[a] defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions.'" *Public Pension Fund Grp. v. KV Pharms. Co.*, 679 F.3d 972, 987 (8th Cir. 2012) (quoting *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.,* 655 F.3d 1039, 1057 (9th Cir. 2011). In other words, "scheme liability" is viable only if Rule 10b-5(b) cannot fully cover the acts—that is, the "scheme" must include deceptions beyond misrepresentations and omissions. *See Public Pension Fund Grp.*, 679 F.3d at 987("We join the Seventh and

Ninth Circuits in recognizing a scheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b-5(b)."); *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 177 (2d Cir. 2005) ("We hold that where the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c).").

In order to impose scheme liability under Rules 10b-5(a) and (c), the SEC must allege and prove that the defendant: (1) "committed a deceptive or manipulative act," (2) "in furtherance of the alleged scheme to defraud," (3) "with scienter." *See, e.g., SEC v. Lucent Technologies, Inc.,* 610 F. Supp. 2d 342, 350 (D. N.J. 2009). Scienter is a required element for claims under the Securities Act § 17(a)(1), the Exchange Act § 10(b) and Rule 10b-5, and the Advisers Act § 206(1). *Aaron v. SEC*, 446 U.S. 680, 701–02 (1980). The element of scienter requires proof of "intent to deceive, manipulate, or defraud." *SEC v. Shanahan*, 646 F.3d 536, 543 (8th Cir. 2011). "Scienter" in this context means intentional or reckless conduct, and can be shown by allegations that the defendant was aware of facts contradicting public statements or that he ignored obvious signs of fraud. *Kuchner v. Beverly Enterprises, Inc.,* 317 F.3d 820, 828 (8th Cir. 2003) ("a finding of scienter may be based upon 'severe recklessness' . . . requiring proof of 'something more egregious than even white heart/empty head good faith.'") (citations omitted). Scienter may be alleged generally under Rule 9(b). *See* Fed. R. Civ. P. 9(b) (stating "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally").

11

B. Reporting/Recordkeeping Claims

Violations of the reporting and recordkeeping requirements of section 13(a), codified at 15 U.S.C. § 78m, unlike violations under section 10(b), do not require scienter. *Accord Ponce v. SEC*, 345 F.3d 722, 737 n. 10 (9th Cir. 2003); *McNulty*, 137 F.3d at 740–41; *SEC v. Koenig*, 469 F.2d 198, 200 (2d Cir.1972) (upholding finding of § 13(a) liability, without mention of scienter, of top corporate officer for failure to include required information in SEC reports); *SEC v. Savory Indus.*, 587 F.2d 1149, 1167 (D.C. Cir. 1978) (reporting provisions of § 13 not intended to be anti-fraud provisions, and therefore do not require scienter). Congress chose to impose a scienter requirement only upon criminal, and not civil, violations of section 13(a); *McNulty,* 137 F.3d at 741; *see* 15 U.S.C. 78ff. Knowingly circumventing or failing to implement a system of accounting controls or knowingly falsifying any books or records is also prohibited. 15 U.S.C. § 78m(b)(5).

C. Aiding and Abetting

Unlike private individuals or investors, the SEC may file actions for aiding and abetting securities violations. *See Stoneridge Inv. Partners*, 522 U.S. at 162 (noting that Congress amended the securities laws to provide for limited coverage of aiders and abettors—aiding and abetting liability is authorized in actions brought by the SEC but not by private parties); *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 176-77 (1994) (holding that there is no private right of action for aiding and abetting a § 10(b) violation); 15 U.S.C. § 78t(e) (1995) (in § 104 of the PSLRA, Congress granted the SEC authority to prosecute the aiding and abetting of securities-law violations under Section 20(e) of the Exchange Act); *Janus Capital Grp.*

*Inc.*, 131 S. Ct. at 2308 (stating that § 10(b) and Rule 10b-5 do not provide for "aiding and abetting" liability in private suits). Under 15 U.S.C. § 78t(e), "any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." 15 U.S.C. § 78t(e).

### III. DISCUSSION

The court finds the defendant's motion to dismiss should be denied. In the complaint, the SEC alleges deceptive acts that are distinct from TierOne's ultimate misstatements in its public filings. It also alleges that the defendant took those deceptive acts in furtherance of a fraudulent scheme. Langford's alleged actions were not otherwise appropriate business transactions: the conduct was inherently designed to deceive the Bank's regulators, regardless of whether the ultimate result was a public misstatement. The factual detail the SEC provides in support of its claim is sufficient to survive a motion to dismiss under Rule 9(b).

Langford is alleged to have departed from normal bank procedures and underwriting standards by failing to obtain or update appraisals in the face of knowledge that the value of the property used as collateral for loans and of property the Bank owned through repossession was deteriorating.

The court also finds that the SEC sufficiently alleges that Langford acted with scienter. Taken as true, the SEC's allegations alternatively allege with considerable factual detail that Langford had a general awareness that he was part of an improper and illegal practice, and that he knowingly or recklessly provided substantial assistance

in those alleged violations. Accordingly, the court finds that the SEC has alternatively sufficiently stated a claim against Langford in its second claim for relief for aiding and abetting the alleged violations in its first claim for relief. Through his actions, he aided and abetted TierOne's fraudulent scheme. The allegations are not implausible—the complaint alleges lax appraisal and purposeful manipulation of loan and collateral valuation to support an erroneous assessment of TierOne's financial position and thus circumvent the regulators' capital requirements.

The SEC has satisfied its burden to state the "who, what, when, where, and how" of the alleged fraud by detailing Langford's conduct with respect to the valuation of several properties. It details the actions he took in response to the need to shore up capital and maintain capital ratios, and chronicles his efforts keep the truth of TierOne's precarious financial position from the regulators. He allegedly performed a deceptive act in creating best/worst case scenarios and not disclosing the results to the auditors or regulators. The court finds the SEC presents enough factual allegations to raise a reasonable expectation that discovery will reveal evidence to substantiate the necessary elements of the SEC's claims, and dismissal under Rule 12(b)(6) is not warranted.

Contrary to the defendant's contention, the SEC's complaint delineates far more than the mere possibility of misconduct. It demonstrates numerous acts by Langford that support its allegations of fraud. Langford's argument that, as a mid-level manager, he lacked authority over any SEC filings is unavailing. The allegations of the complaint show that he was in a position of control over the valuation of the loans and OREO properties, and he failed to properly obtain appraisals knowing that the value of the

properties had declined. The court also rejects the defendant's arguments that his actions were not deceptive because the appraisals supporting the impaired loan templates were accurately dated, and that auditors were not deceived into relying on stale and outdated appraisals because the severe drop in real estate values was obvious and well-known. Knowledge of a market downturn cannot be equated with the specific knowledge of the nature and extent of a financial loss that would have been revealed in accurate appraisals.

The court also rejects the defendant's argument that the SEC's claim is an attempt to plead around the limitation set out in *Janus Capital Grp.*, 131 S. Ct. at 2304, that only a "maker" of a material misrepresentation is liable under Rule 10b-5(b), by casting defendant's conduct as a "scheme" rather than a misstatement under Rule 10b-5(b). The court agrees with the SEC that *Janus* is inapposite because this is a scheme liability claim relating to actionable conduct rather than to statements. Only if the sole basis for liability was an alleged misrepresentation or omission, could it be said that the SEC was attempting to plead around *Janus* recasting a misrepresentation claim as a scheme claim. Here, however, the deceptive conduct alleged by the SEC goes beyond misstatements or omissions. The scheme alleged herein did not become deceptive only through misstatements in public filings; the alleged conduct is inherently deceptive and distinct from the alleged misstatement. Though the defendant's improper actions may have resulted in misstatements as to financial condition that were eventually reported to the public, Langford's conduct with respect to the valuation of properties amounts to more than making a false statement. Langford took actions designed to deceive the regulators, and to present a false picture of the Bank as a solvent entity.

The court further finds that the SEC has adequately alleged facts supporting the claims of books, reporting and recordkeeping violations. The complaint adequately alleges that the Bank's records did not accurately reflect the value of its assets, and also alleges that the defendant failed to comply with internal accounting controls and failed to disclose material information to auditors and accountants. The complaint also sets out facts that support the claim that Langford knowingly or recklessly assisted the Bank's reporting and recordkeeping violations. Accordingly,

IT IS ORDERED that the defendant's motion to dismiss (Filing No. 16) is denied.

Dated this 9th day of May, 2013.

> BY THE COURT:
>
> s/ Joseph F. Bataillon
> United States District Judge